ARROWHEAD MOUNTAIN GETAWAY, LIMITED, PEGGY KNOX, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Arrowhead Mt. Getaway v. Commissioner
Docket No. 2237-92
United States Tax Court
T.C. Memo 1995-54; 1995 Tax Ct. Memo LEXIS 47; 69 T.C.M. (CCH) 1805; January 31, 1995, Filed *47 Decision will be entered under Rule 155. For petitioner: Valdean Watson.
Gregory A. Knox, intervenor, pro se. For respondent: Thomas R. Lamons. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent issued notices of final partnership administrative adjustment (FPAA's) reflecting adjustments to the partnership returns of income of Arrowhead Mountain Getaway, Ltd. (the Partnership or Arrowhead), as follows: Long-Term
Short-Term
Self- Ordinary Capital
Capital Employment
Year
Income
Gain Gain
Income
1984
$ 792,551  --
--
--
1985
1,041,391
--
--
--
1986
1,056,717
($ 191,117)
--
$ 9,235  1987
1,057,316
--
($ 17,252)
110,700
1988
765,887
--
--
52,350
All the adjustments are in dispute. Arrowhead is a California limited partnership formed on December 12, 1983. Petitioner Peggy Knox (petitioner), who is the wife of Gregory A. Knox (Mr. Knox or intervenor), the tax matters partner and nominally the sole general partner of the Partnership, filed a petition with this Court as authorized by sections 6226(b)(1) and 6231(a)(2)(B). [1] We permitted Mr. Knox, as the tax matters partner, to intervene pursuant to section *48 6226(b)(5) and Rule 245(a) and (c). Respondent determined that all transactions in which the Partnership purported to engage, both with James K. and Pamela H. Strebel (the Strebels) and with the limited partners, were shams that are to be disregarded for tax purposes. Respondent therefore disallowed all the Partnership's claimed deductions, including purported interest accruals, and claimed capital gains. [2] Respondent also determined, in the alternative, that the Partnership's method of accounting materially distorts income, and that the distortion *49 provides an independent ground for disallowing all interest deductions claimed by the Partnership. For the reasons that follow, we uphold in full the adjustments resulting from respondent's determinations, excluding from gross income, however, the amounts of gross rents and gross receipts received from the limited partners and reported by the Partnership. FINDINGS OF FACT Some of the facts in this case have been stipulated and are so found. By this reference, we incorporate the first and second stipulations of facts, supplemental stipulation of facts, and attached exhibits. I. The Parties
When the petition was filed, petitioner and intervenor resided in -- and the Partnership had its mailing address at -- Redlands, California. Mr. Knox received a J.D. degree from Brigham Young University *50 in 1977. He thereafter became a financial planner and salesman of financial products, but has never been licensed to practice law in any jurisdiction. While employed by an insurance company, he first encountered a tax shelter program in the form of a computer sale/leaseback program. He was also a salesman for the Kilburn Vacation Homeshares and Admiral Beach Hotel resort timeshare programs. [3] He thereafter began to formulate the Arrowhead program, which he characterized as his own program to provide a "reasonably-priced time share vacation to middle-class investors with some tax benefits." II. Initial *51 Dealings of Mr. Knox and Partnership With the Strebels
In 1983, Mr. Knox moved to Lake Arrowhead, California, to find a house he could use to put his program into effect. In the second half of 1983, when the Strebels heard that Mr. Knox was looking for such a house, they let him know that they had a house for sale. The house owned by the Strebels was located at 1359 Portillo Lane, Lake Arrowhead, California (the Arrowhead property), and they were using it as their residence in 1983. As of December 1983, the fair market value of the Arrowhead property as a residence was less than $ 150,000. Mr. Knox visited the Arrowhead property and decided that it was suitable for his purposes. He then informed the Strebels that he was willing to buy the property only on terms that he had already arrived at. These terms included dividing the property into 52 "time share weeks", to be sold to a partnership for $ 6,000 each. The downpayment for each timeshare week was to be $ 1,500, with payment of the remaining $ 4,500 deferred for 40 years under a "zero coupon bond" formula, with interest compounding at 13.6 percent annually, payable currently only in certain circumstances. Mr. Knox believed *52 the Arrowhead property to be worth about $ 2,500 per timeshare week, or $ 130,000, as a residence. On December 31, 1983, the Partnership (see infra pp. 10-14) and the Strebels entered into their first Property Interest Purchase Agreement, which had been prepared by Mr. Knox. Under that agreement, the Strebels purported to divide their fee interest (subject to their liability under a mortgage loan dated September 7, 1979, in the original principal amount of $ 66,000 in favor of the Bank of America, which the Partnership took subject to) in the Arrowhead property into 10 units, and to sell units to the Partnership for $ 31,200 per unit. Each unit represented 5.2 weeks of occupancy per year. Pursuant to the agreement, the Strebels agreed to "create ten undivided fractional interests in common tenancy in the real property". The interests sold by the Strebels to the Partnership were "undivided interests as tenant-in-common" in the real property and improvements in question. Under the agreement, of the $ 31,200 purchase price for each one-tenth undivided interest in the property (representing 5.2 weeks of occupancy), $ 7,800 was a downpayment, which could be paid "in cash or other *53 valuable property." The balance of principal plus accrued interest was to be due and payable on December 31 of the 40th year after the year of purchase. [4]
The Partnership agreed to pay the Strebels a purchase price of $ 6,000 per week of ownership, which is equivalent to a purchase price of $ 31,200 per unit, or $ 312,000 for all 10 units. Of the $ 6,000 purchase price, $ 1,500 was a downpayment, and the remainder of $ 4,500 was deferred principal. The Strebels agreed that they would have no recourse for payment of principal or interest against any partner of the Partnership. It was an express condition of the Strebels' obligation to perform that the Partnership would establish a reserve fund for payment of the principal due: the fund would have to equal $ 4,186 per *54 property interest, be established by December 31, 1988, and grow at such a rate that it would equal $ 358,800 [5] on December 31, 2023. If the Partnership failed to perform its contractual obligations, the Strebels had a choice of remedies, including the right to re-enter and take possession of the Arrowhead property. Under the first Property Interest Purchase Agreement, the Strebels "conveyed" 1.923 property interests (representing 10 weeks of occupancy) to the Partnership. If the Partnership failed to meet its obligations, the Strebels were to have the right to various remedies, including recovery of the property, but on condition that they not disturb the quiet and peaceful use of the property by purchasers of Getaway Packages. [6] In return, the Partnership *55 undertook not to offer or sell any accommodations which pertained to the Arrowhead property for more than 1 year, or which would become effective later than 2 years from the date of the sale. This commitment was significant because it helps to explain limitations which we will discuss on interests sold to the limited partners. During 1984, the Partnership entered into an Amendment to Property Purchase Agreement dated "as of December 31, 1984" under which interest on the unpaid balance of the purchase price would be compounded according to the same straight-line formula (see infra p. 27) used by the Partnership for the calculation of its interest deductions. Cash interest payments to the Strebels were also permitted under the Property Purchase Agreement after the first 5 years under a formula that applied a discount rate of 13.6 percent, but only if all required additions to the reserve fund had been made. If a cash interest payment was permitted but not made *56 in any given year, an additional contribution to the reserve fund was required. On December 31, 1984, the Strebels and the Partnership entered into a second Property Interest Purchase Agreement, by which the Strebels "conveyed" to the Partnership 5.67 one-tenth undivided interests as tenants in common in the property (representing 29.5 weeks of occupancy). The terms and conditions of that agreement were virtually identical with those of the first Property Interest Purchase Agreement. On December 31, 1984, the Partnership and the Strebels also executed an Addendum to Property Interest Purchase Agreement. The terms of this Addendum were identical with the amendment to the first agreement. On December 30, 1985, the Strebels and the Partnership entered into a third Property Interest Purchase Agreement, by which the Strebels "conveyed" to the Partnership 2.31 one-tenth undivided interests as tenants in common in the property (representing 12 weeks of occupancy). The terms and conditions of this third agreement were virtually identical with those of the first. On December 30, 1985, the Partnership and the Strebels also executed an Addendum to Property Interest Purchase Agreement *57 that was identical with the amendments to the first and second agreements.
On December 31, 1987, the three Property Interest Purchase Agreements were recorded in the official records of San Bernardino County, California. Mr. Knox derived many of the ideas for the Partnership from the Kilburn and Admiral Beach timesharing programs. He patterned the written agreements used by the Partnership on the agreements used in the Admiral Beach program. The Partnership purported to satisfy its obligation to make downpayments under the three purchase agreements (of 1983, 1984, and 1985) by assigning to the Strebels -- on December 31, 1983, in December 1984, and in December 1985, respectively -- promissory notes issued by limited partners to acquire their Getaway Packages. While the Partnership had assigned to the Strebels the promissory note executed by Julie Kenney, one of the limited partners, the Kenneys were unaware of the assignment and made their payments directly to the Partnership or to Mr. Knox. The Partnership deferred payment of the full amount of interest "accruing" under the property interest purchase agreements for the years 1983 through 1987 inclusive. During the year 1988 *58 at least some of the interest accruing was deferred. III. Dealings of Mr. Knox and Partnership With Investors
A. Formulation, Organization, and Promotion of Partnership
After agreeing on terms with Mr. Strebel, Mr. Knox began to market the Arrowhead program to prospective investors. The Arrowhead program provided for the sale to investors of "Getaway Packages", which included limited partnership interests and reservation privileges in the Arrowhead property. In marketing the Arrowhead program to prospective investors, Mr. Knox represented and emphasized the tax savings that participants in the program would be entitled to. Mr. Knox presented the program to prospective investors as a dual opportunity to obtain $ 17,000 in annual tax deductions for 5 years for a cash investment of $ 2,500 per year and to use a vacation facility at a modest price. Mr. Knox also provided prospective investors with written promotional materials that emphasized the tax savings that they would be entitled to. The promotional materials also predicted that the Internal Revenue Service (IRS) would "not like such high interest deductions" but assured prospective investors that the Partnership *59 was "operating well within the tax law" and could ably defend its (and the investor's) position. Beginning in 1984, Mr. Knox added language to the promotional materials to assure prospective investors that "TAX LAW CHANGES MADE IN 1984 DO NOT APPLY TO 'ARROWHEAD' INTEREST DEDUCTIONS" and appended an "income projection", which assumed that the value of the real estate interests to be acquired by the Partnership would appreciate at an annual rate of 7 percent. Beginning in 1986, the promotional materials were further modified to add language to assure investors that "TAX LAWS PASSED IN 1986 WILL NOT AFFECT 'ARROWHEAD' DEDUCTIONS IN 1987 AND BEYOND, IF THE PRESENT BUSINESS STRUCTURE IS SLIGHTLY MODIFIED". Prospective investors in the Partnership, including all the limited partners, were given copies of the promotional materials applicable for the year of investment and were shown a copy of the Limited Partnership Agreement at or prior to the time they executed the Agreement to Purchase. Some prospective limited partners or their advisers were also shown some of the legal opinions previously issued for the Kilburn and Admiral Beach programs. B. The Partnership Agreement
On *60 December 12, 1983, Mr. Knox as sole general partner and his uncle Donald Knox as limited partner executed a Limited Partnership Agreement (the Partnership Agreement). Pursuant to Article Six of the Partnership Agreement, a capital contribution of $ 500 (in the form of cash or a promissory note) was required to purchase one limited partnership interest in the Partnership. Limited partnership interests in the Partnership were sold exclusively as part of a Getaway Package, which consisted of one partnership unit plus a 1-year prepaid reservation privilege, called a "Resort Privilege". [7]
Pursuant to Article Seven of the Partnership Agreement, the General Partner was required to contribute $ 1 to the Partnership's capital plus an additional $ 1 for each limited partnership interest purchased. Pursuant to Article Eight of the Partnership Agreement, the General Partner was to receive a management fee *61 in the amount of $ 1,250 per unit sold for the year of sale and for each of 4 years thereafter, and a management fee of $ 100 per unit sold for all subsequent years. Purchasers of limited partnership interests were advised that they could not "expect to make a cash profit from holding such units". Rather, the economic benefit was the expectation of enjoying savings on vacation accommodations and services associated with the purchase of resort privileges after the first 5 years, if they were offered. Article Eight also provided that purchasers of limited partnership interests did not receive any interest in partnership land or buildings, but only an interest in partnership personal property and "enterprise value". Pursuant to Article Nine, net profits and losses of the Partnership (after deduction of fees due the general partner) were to be allocated 99 percent to the "Getaway Package-Limited Partners" and 1 percent to the General Partner "until such point as each Getaway Package-Limited Partner has been allocated a net cumulative total amount of profits and losses equal to no more than the total amount of money he has paid for the Getaway Package, including Resort Privileges." *62 Thereafter, 100 percent of profits and losses of the Partnership were to be allocated to the General Partner, and the partners would not receive a distribution of profits, gain, or return of capital until the dissolution, termination, or winding up of the partnership. Pursuant to Article Eleven, the Partnership had a 60-day option to repurchase Limited Partnership Units for $ 1 per unit from limited partners who chose not to purchase and pay for resort privileges on the terms set by the General Partner, if they were offered by the Partnership. There were significant restrictions, including the need for the General Partner's consent, on the transfer of limited partnership interests. Article Fourteen stated that the Partnership expected to use "unconventional financing methods", deferral of principal payments "for up to 40 years, or longer", and interest accruals exceeding "the fair market value of the property in the early years of the loan contract." Article Fifteen referred to conflicts of interest associated with the limited partnership because Mr. Knox would be acting as general partner, sole legal counsel on all tax and nontax matters, sales representative, and "day to day *63 manager" of the resort business. Article Fifteen also adverted to risks associated with the investment resulting from the expectation that the IRS was likely to challenge the Partnership's reporting of certain items of expense. C. The Agreement of Purchase
In order to acquire a Getaway Package, the investor executed an "Agreement of Purchase" with the Partnership. The investor's cost for a Getaway Package was $ 2,500, of which $ 500 was characterized as a contribution to capital (related to the acquisition of the partnership unit), and the remaining $ 2,000 as the purchase price for the 1-year reservation privilege. In the initial year of participation, $ 500 of the $ 2,500 purchase price was treated on the Partnership's books as a contribution to capital, and the remaining $ 2,000 was treated as prepaid rental income. Limited partners did not receive rights to use the Arrowhead property after the first year of membership as an incident of the Getaway Package. Instead, additional stays after the first year of membership required additional payments to the Partnership. The Agreement of Purchase stated that, after their first year of membership, resort privileges could *64 be offered to limited partners for $ 2,500 per year for 4 years, and that, after they had been in the program for 5 years, resort privileges, if offered, would be offered to them for $ 250 per year "in 1983 dollars". The Agreement of Purchase also stated that the Partnership was not obligated to offer Resort Privileges to limited partners in any year after their initial year of participation. The general partner of the Partnership could elect at some point not to offer resort privileges to some or all limited partners in order to make the property available for public rental. A resort privilege consisted of the use of one guaranteed 3-day (Friday through Sunday) weekend per year at the Arrowhead property, and the opportunity to use the property on weekdays (Monday through Thursday) for periods of up to 2 consecutive days on a reservation basis. The Partnership did not guarantee that the property would be available to an investor beyond the guaranteed 3-day weekend. From 1983 through 1987, the rental value of the Arrowhead property was between $ 400 and $ 900 per week. The form of Agreement of Purchase signed by all purchasers in 1983 and by many purchasers in 1984 contained *65 the following provisions: Limited partners were to expect no cash profit but only recovery of 100 percent of cash paid in upon dissolution or other eventuality under "the most favorable circumstances" (paragraph 7). Sales or assignments could not be for less than 100 percent of money paid in by the selling partner up to that point, and the form stated that no public market for Getaway Packages was likely to exist (paragraph 8). A sale or repurchase of units in the early years of the Partnership was said to be "likely to result in detrimental tax consequences for the seller" (paragraph 9). Finally, the General Partner had authority "to execute any and all appropriate instruments and to do or have done all things necessary to the creation and continuation of the Partnership as a business" (paragraph 10). D. Investors' Purchases/Use of Getaway Packages/Resort Privileges
In late December 1983, the Partnership sold 10 Getaway Packages to six investors. During 1984, the Partnership sold 29.5 Getaway Packages to 19 additional investors. During 1985, the Partnership sold an additional 12 Getaway Packages, 1 to an existing limited partner and 11 to eight new limited partners. *66 During 1986, the Partnership sold an additional six Getaway Packages to three existing and two new limited partners. In exchange for their purchases of Getaway Packages and Resort Privileges, most limited partners paid small amounts of cash, or no cash, and also executed (full recourse) promissory notes for the remainder of the $ 2,500 purchase price. In exchange for their purchases of Getaway Packages, several limited partners contributed to the Partnership options to buy their interests in certain Kilburn Vacation Homeshares or Barbados (Admiral Beach) limited partnerships. A few conveyed to the Partnership their interests in certain Kilburn Vacation Homeshares property. In 1987 or 1988, Mr. Knox purchased six Getaway Packages, and according to the Agreement of Purchase he paid the unusually favorable (relative to the limited partners) price of $ 6 (in cash or promissory notes) to the Partnership for the Getaway Packages, plus $ 12,500 for reservation privileges. Pursuant to the terms of the Partnership Agreement, partnership interests and/or reservation privileges of various limited partners were repurchased or liquidated by the Partnership for $ 1 per partnership interest *67 owned. After some of those limited partners withdrew from the Partnership in 1986, the Partnership closed out each withdrawing partner's cumulative income account and issued him a Schedule K-1 in 1987 reflecting as capital gain income the amount of the negative balance of the account. The limited partners as a group made considerable use of the Arrowhead property, amounting to as much as 194 days in 1987 and more than 100 days per year from 1985 through 1988, and the 2 succeeding years. Nevertheless, most limited partners used the property for only a few days each year, and some used it not at all. IV. Partnership Operations, Changes, and Conflicts of Interest
A. Fees and Rental Payments to Mr. Knox and the Strebels
Under authority granted by the Partnership Agreement and the Agreements of Purchase, Mr. Knox hired himself to manage the Partnership and the Arrowhead property for a fee of $ 1,250 per partnership unit or resort privilege sold. Pursuant thereto, he also hired himself as a consultant to the Partnership; for his services as such the Partnership agreed to pay him a sales commission equal to 30 percent of all amounts collected "from the public or clients" *68 for the purchase of partnership units or resort privileges in the year of sale and the 4 years immediately following (so that he apparently could collect 30 percent of all payments from the limited partners). Contractual arrangements for his services varied from year to year, but a Services and Management Contract, dated December 31, 1984, also provided that Mr. Knox was retained to perform "legal & tax work", for which he was to receive $ 42,775 in 1985. Between approximately June 1985 and August 1988, Mr. Knox retained the Strebels to manage the property while he was residing in Utah. Under an oral agreement with Mr. Knox, the Strebels were paid $ 1,000 per month for their services. In October 1985, Messrs. Knox and Strebel, as "Owners", entered into a brokerage agreement with Arrowhead Estates Realty, Inc., an unrelated third party, regarding the rental of the Arrowhead property. In 1985, 1986, and 1990, Arrowhead Estates Realty, Inc., transmitted payments to Mr. Knox for rentals of the property as follows: Year
Rental Payments
1985
$ 2,103.50
1986
1,743.00
1990
1,815.00
Mr. Strebel also received payments under the same agreement. In 1992, Mr. Knox also received *69 $ 2,400 of rental payments from Century 21 High Country relating to rental of the Arrowhead property. The Arrowhead property was rented to the public only "infrequently". The brokerage agreement with Arrowhead Estates Realty, Inc., called for a daily rental rate of $ 165, or a weekly rate of $ 825. B. Amendments to Partnership Agreement
In his capacity as general partner, and in accordance with his powers under the Partnership Agreement and the Agreements of Purchase, Mr. Knox "orally amended" the partnership agreement on or about December 29, 1983, to alter the provisions regarding profits and transferability of partnership interests. The profit allocation after limited partners had received back 100 percent of their payments was altered to provide for 20 percent to the general partner and 80 percent to the limited partners; transfers of partnership interests were to be allowed as long as the number of limited partners was not increased. At that time, the written terms of the Partnership Agreement and of the Purchase Agreements were not altered. In 1984, a written "amendment" to the Partnership Agreement was executed by Mr. Knox "as of December 29, 1983", and this amendment *70 was reflected in the Certificate of Limited Partnership that had previously been filed with the county recorder on December 30, 1983. After the Partnership Agreement had been amended, the Partnership continued through December 1984 to use form purchase agreements which reflected the original terms of the Partnership Agreement. Although Mr. Knox explained the amendments to the Partnership Agreement to new investors in 1984, he also advised many of them to sign Agreements of Purchase which included terms that were inconsistent with the amended terms of the Partnership Agreement. In his capacity as general partner, and in accordance with his powers under the Partnership Agreement and the Agreements of Purchase, Mr. Knox executed several other amendments to the Partnership Agreement. No amendments to the certificate of limited partnership were ever filed, either with the San Bernardino County recorder or with the California secretary of state, to reflect these alleged modifications of the terms of the Partnership Agreement. C. Attempted Partnership Restructuring
In December 1987, Mr. Knox attempted to restructure the Partnership by having the limited partners transfer their *71 limited partnership interests to one of four sub-tier limited partnerships, named Elite Mountain Resorts, Exclusive Mountain Resorts, Mountain Resorts, and Southern California Mountain Resorts. He did this, on the advice of an attorney, in an attempt to avoid having limited partners' tax refunds frozen by the IRS under Rev. Proc. 84-84, 1984-2 C.B. 782. [8] In order to effectuate the restructuring, Mr. Knox secured from the limited partners special power of attorney forms, which authorized him to make various amendments and transfers on their behalf. Assignments of interests were secured from all limited partners, and letters of authorization were sent to all limited partners by Mr. Knox. These documents stated that the changes were being made "for the purpose of Estate Planning and ease of management." The Articles of Limited Partnership for all four sub-tier partnerships were submitted for filing to the California secretary of state by Mr. Knox, but they were returned to him and he never resubmitted them. The limited partners were notified of the restructuring but were not shown copies of the Articles of Limited Partnership for the sub-tier *72 partnerships. Many of them did not understand the "restructuring". D. Payments to or for Benefit of Mr. Knox
The Partnership made payments to Mr. Knox in the following amounts during the years in issue: 1984
1985
1986
1987
1988
$ 45,450
$ 45,775
$ 32,200
$ 48,993
$ 32,403
The partnership also made various payments totaling $ 43,210.02 to Michael *73 Schoeny (Mr. Knox's assistant) from 1985 to 1988 as compensation for services performed for Mr. Knox, or as repayments of loans by Michael Schoeny to Mr. Knox. The Partnership made additional payments amounting to $ 16,576 from 1986 to 1989 to Jo Ree Schoeny (Michael Schoeny's mother), Betty Schoeny (Michael Schoeny's sister-in-law), and Steve Schoeny (Betty Schoeny's husband), all as repayments of loans by those persons to Mr. Knox. Michael Schoeny had signature authority on the Partnership's bank account at First Interstate Bank at the time the payments were made to him and his relatives. Michael Schoeny signed checks payable to himself, relatives, and other payees on behalf of the Partnership. The Partnership made payments amounting to $ 2,080 to Peggy Knox from 1985 to 1989. It made religious tithe payments amounting to $ 800 on behalf of Mr. Knox in 1985 and 1988. Mr. Knox had signature authority on the Partnership's bank accounts at all relevant times. He signed on behalf of the Partnership the checks payable to himself, Peggy Knox, and other payees, as well as the tithe payments. During some of the years in issue, Mr. Knox commingled funds of the Partnership with his *74 own personal funds. E. Use of Property by Mr. Knox and the Strebels
The Strebels continued to use the Arrowhead property on occasion and to have groups stay there overnight after the "sale" of 51.5 weeks of occupancy. In December 1987, the Partnership purchased from Robert Montelius various promissory notes payable by George Mayers to Tax Engineers, Ltd., a computer software "investment" project designed and promoted by Mr. Knox. Of the $ 43,750 purchase price for these promissory notes, $ 29,250 and accrued interest was not due and payable until December 31, 2024. Interest on the unpaid balance was computed in the same manner as set forth in the Amendment and Addenda to the Property Interest Purchase Agreements. In December 1987, the Partnership transferred to the Strebels its interest in notes in favor of Tax Engineers, Ltd., "in the amount of $ 29,250 or greater." As part of the transfer to the Strebels of these notes, the Strebels agreed to execute a Trust Deed in favor of the Partnership as "transferor". On December 30, 1987, the Strebels executed an "all-inclusive trust deed" on the Arrowhead property in favor of Mr. Montelius, in order to secure their assumed *75 indebtedness to him in the amount of $ 29,250, and this deed was filed on December 31, 1987 with the San Bernardino County recorder. On July 24, 1991, Mr. Montelius executed an agreement subordinating his security interest to another lien to secure additional indebtedness in the amount of $ 125,000 that was about to be placed on the Arrowhead property. [9] On September 23, 1991, Mr. Montelius executed a full reconveyance, by which his security interest in the Arrowhead property was released, and transferred to another property located in St. George, Utah, owned by Mr. Knox. On June 5, 1988, the Strebels and Mr. Knox entered into a joint venture agreement relating to the development of certain property located adjacent to the Partnership's Arrowhead property, at 1333 Portillo Lane. On June 22, 1988, the Strebels recorded a quitclaim deed conveying their interest in the *76 1333 Portillo Lane property to Mr. Knox. On December 28, 1989, Mrs. Strebel executed (and on December 31, 1992, filed with the San Bernardino County recorder) a Property Exchange Agreement which among other things granted to certain partnerships (largely named after identified limited partners of Arrowhead Mountain Getaway, Ltd.) interests in the 1333 Portillo Lane property "(or a comparable site)". On December 31, 1991, in fulfillment of this agreement, Mrs. Strebel conveyed the Arrowhead property (1359 Portillo Lane) to these partnerships as such a "comparable site". The Property Exchange Agreement was executed by Mr. Knox as partner in the various partnerships that were parties to the agreement. On September 25, 1991, the Partnership entered a Property Exchange Agreement with the Strebels by which the Partnership agreed to exchange its interest in the Arrowhead property for the similar property to be developed on 1333 Portillo Lane. On the same date Mr. Knox executed a quitclaim deed (which he recorded on October 1, 1991) conveying his interests in 1333 Portillo Lane to the Strebels. On September 26, 1991, the Partnership recorded a quitclaim deed conveying its interests *77 in the Arrowhead property back to the Strebels. Prior to the time of trial, legal title to 1333 Portillo Lane had been conveyed back to the Strebels. At the time of trial, legal title to the Arrowhead property belonged to the various partnerships (largely named after the partners) to which Mrs. Strebel had conveyed it on December 31, 1991. F. No Rentals or Transfers of Interests by Limited Partners
No limited partner ever rented to the public his right to occupy the property. Normal occupancy rates for rental properties in the Lake Arrowhead area in the years in question ranged from 20 percent to 30 percent. There was no market for the sale of the limited partners' partnership interests to the public. During the years 1983 through 1988 inclusive, the only occasions when a limited partner of the Partnership transferred or exchanged his limited partnership interest, interests, or reservation privileges were when partnership interests were liquidated or repurchased by the Partnership for the nominal amount of $ 1. G. "Funding" the Reserve Fund
In order to provide for payment to the Strebels of the deferred purchase price under the Property Interest Purchase Agreements, *78 Mr. Knox was required by the end of 1988 to contribute funds to the Reserve Fund and invest them in such a way as to produce net appreciation at a rate of 13.6 percent (see supra p. 7). In an effort to "fund" the Reserve Fund, Mr. Knox and the Partnership assigned their interests in various promissory notes, the bulk of which had been assigned to him by Investment Engineers, Ltd., to Reserve Fund Trusts Numbers 1, 2, and 3, established in 1988, 1989, and 1990. The trustee of Reserve Fund Trust Number 1 was Michael Schoeny, and the trustee of Reserve Fund Trusts Numbers 2 and 3 was Marc A. Murdock. V. Economic, Tax, and Accounting Facts
A. Partnership Income Sources
The Partnership received no income from public rentals during 1983, 1984, and 1987. The Partnership's U.S. Partnership Returns show gross rents in relatively large amounts from 1983 through 1988: Year
Rental Payments
1983
$ 20,000 1984
68,500
1985
88,250
1986
133,250
1987
128,750
1988
45,531
The Partnership's books reflected rental resort "payments" on receipt of promissory notes from limited partners and rental "income" on an accrual basis. Because income from public rentals was *79 much smaller (see supra p. 18), the bulk of these "gross rents" were "payments" from the limited partners. However, there is no evidence that the public rental payments ever went to the Partnership; therefore the "gross rents" and "gross receipts" came in their entirety from the limited partners. B. Partnership Deductions
On its U.S. Partnership Returns for years 1983 through 1988, the Partnership reported rental expenses as follows: Year
Expense
1983 1984 1985 Management
$ 20,000 --
$ 49,375   Interest
184,493
$ 728,775
950,175
Sales
--  19,740
37,125
Legal
--  42,775
-- Operating
--  1,261
-- Totals
204,493
792,551
[1] 1,041,391
Year
Expense
1986 1987 1988 Management
$ 64,375   $ 64,375   --  Interest
950,175
950,175
$ 765,887
Sales
38,625
38,625
--  Legal
-- -- --  Operating
3,542
4,141
-- Totals
1,056,717
1,057,316
765,887
For 1987, the total rental expenses of $ 1,057,316 were reported unitemized, but they were made up as *80 shown above. "Management", "Sales", and "Legal" expenses for the years at issue represent fees paid to Mr. Knox for his services; "Operating" represents utilities and other expenses paid to third parties; "Interest" represents amounts purportedly accrued under the Property Purchase Agreements between the Strebels and the Partnership. For each of the years 1984 through 1988, the Partnership "accrued" interest on the deferred portion of the purchase price. The amount of interest accrued and reported for Federal income tax purposes on the Partnership's partnership returns for each year of the Partnership was approximately $ 18,450 for each Getaway Package and was calculated according to the following formula: Annual interest = beginning unpaid balance [$ 4,500] compounded at 13.6% x 40 [years] divided by 40 = $ 18,350 per week of occupancy purchased.
C. Economic Accrual Rates
The following table shows the economic accrual of interest expense on the "loans" from the Strebels to the Partnership (see infra p. 30 and note 11) and the extent to which the Partnership's straight-line accounting method departs from the economic-accrual method for the years in issue and *81 the immediately preceding year: Tax Year
Economic Accrual
Reported Accrual
1983
$ 6,120 $ 184,493
1984
25,006
728,775
1985
35,751
950,175
1986
40,613
950,175
1987
46,137
950,175
1988
52,411
765,887
VI. Ultimate Findings of Fact
The fair market values of the property interests purchased by the Partnership from the Strebels and of the privileges purchased by the limited partners were much less than the prices that the purchasers purportedly obligated themselves to pay for the respective interests and privileges. Neither the property interests nor the privileges purchased respectively by the Partnership and the limited partners would appreciate to the point where their respective fair market values would equal or exceed the balloon payments due in year 40; inasmuch as the financings are nonrecourse, the Partnership and limited partners will forfeit their interests rather than make the balloon payments. The arrangements between the Partnership and the Strebels and between the Partnership and the limited partners (both purchases and loans) are economic shams. OPINION Petitioner bears the burden of proving the Partnership's right to claimed deductions. *82 Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79,    , 112 S. Ct. 1039, 1043 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Mammoth Lakes Project v. Commissioner, T.C. Memo. 1991-4 (petitioner bears burden of disproving determinations in FPAA in cases filed under TEFRA partnership proceedings). Issue I: Method of Accounting
Having found as an ultimate fact that the arrangements in this case are economic shams, we first address respondent's rejection of the Partnership's method of accounting under section 446(b). The Partnership's method of accounting was its primary reason for being and the driving force of its transactions: the method of accounting provided the purported tax advantages; by understanding the method of accounting we understand the nature of the Partnership and its transactions. The method of accounting also illuminates the motives of the participants and provides an important reason for concluding that their transactions were shams. [10] An entity's method of accounting may show a lack of good faith in its dealings, *83 or have a bearing on whether its transactions have economic substance. Cf. Estate of Ratliff v. Commissioner, 101 T.C. 276, 279, 281 (1993). Under the Partnership's so-called straight-line method of accounting, the total indebtedness from interest that will have purportedly accrued by compounding over the 40-year term is divided into equal installments that are allocated to each of the 40 years of the term. The Partnership's accounting method therefore ignores the increase over time in the economic benefit from the compounding of interest that the deferral of the payment of interest provides. This means that, for a term as long *84 as 40 years, economic realities are grotesquely distorted. Economic realities are truly reflected by the economic-accrual method, which allocates the total debt in such a way that the amount of interest accrued each year increases as the amount of debt (principal plus interest) increases. Each year's accrual is properly calculated by multiplying the interest rate by the sum of the total indebtedness built up through the previous year (i.e., including that previous year's accrued interest), plus any new indebtedness incurred through additional purchases during the current year. [11]
*85 We agree with respondent that petitioner's method of accounting did not clearly reflect income, just as this Court and the Court of Federal Claims so agreed in rejecting the taxpayers' use of the Rule of 78's [12] in Prabel v. Commissioner, 91 T.C. 1101, 1111-1120 (1988), affd. 882 F.2d 820 (3d Cir. 1989), and Mulholland v. United States, 28 Fed. Cl. 320, 336-339 (1993), affd. without published opinion 22 F.2d 1105 (Fed. Cir. 1994). See also LaVerne v. Commissioner, 94 T.C. 637, 651 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); Levy v. Commissioner, 92 T.C. 1360, 1366-1369 (1989). *86 Although the Rule of 78's would be more egregiously abusive in the case at hand than the Partnership's straight-line method, that straight-line method, using a 13.6-percent interest rate, frontloads 23 times as much interest over the first 5 years of a 40-year loan as the economic accrual method.[13] Consequently, what we said in Levy v. Commissioner, supra at 1368, and quoted in LaVerne v. Commissioner, supra at 651, as justification for disallowing the use of the Rule of 78's, also applies to the Partnership's straight-line method: Petitioner misses the primary point of Prabel, namely, that where interest accruals calculated under the Rule-of-78's method materially exceed the amount of interest that would be accrued under the economic-accrual method and where the interest accruals under the Rule-of-78's method materially exceed the amount of interest the taxpayer is required each year to pay under the payment schedule established in the loan transaction, respondent has the authority under section 446(b) to remedy the resulting distortion in the taxpayer's taxable income. Prabel v. Commissioner, supra at 1116-1119. *87 [Levy v. Commissioner, supra at 1368.]
Petitioner argues that the all-events test for the interest deductions has been met and that they are therefore allowable. However, a sham debt fails to satisfy the requirement of economic performance under section 461(h) for the satisfaction of the all-events test for deductions that would otherwise have been allowable after July 18, 1984. Maier Brewing Co. v. Commissioner, T.C. Memo. 1987-385, affd. without published opinion 916 F.2d 716 (9th Cir. 1990). Moreover, even if this test had been satisfied, our recent decision in Ford Motor Co. v. Commissioner, 102 T.C. 87 (1994), establishes that an accounting method that satisfies the all-events test can still be disallowed if it does not clearly reflect income. Id. at 95, 101. [14] The amounts of interest that would *88 accrue under the Partnership's method here exceed both the amounts economically accrued and the amounts actually paid. Therefore, under the test of Levy v. Commissioner, supra, the Partnership's method of accounting fails to reflect income clearly.
Section 446(b) instructs the Secretary to calculate the taxpayer's *89 taxable income "under such method as" in his (the Secretary's) opinion "does clearly reflect income" if the method used by the taxpayer "does not clearly reflect income". The taxpayer is not obliged to provide an alternative method of calculation. Here, respondent, under her alternative method-of-accounting ground, disallowed the Partnership's interest deductions in full because the Partnership "failed to establish the proper [amounts] of the interest expense [deductions] which would be allowed for the taxable [years]". However, respondent's total disallowance and failure to substitute a proper method of accounting such as economic accrual is not an abuse of discretion in the circumstances of this case. Disallowance of the deductions in their entirety is in effect the method of accounting that accurately reflects income, inasmuch as the transactions were shams. To an explanation of our conclusion on that issue we now turn. Issue II: Sham Transactions
Respondent's primary ground for disallowing the Partnership's claimed deductions in their entirety is that its transactions were economic shams [15] on two levels: First, as to the "sales" of the real property interests by *90 the Strebels to the Partnership (as well as the associated "loans"); and second, as to the purported limited partnership agreement between the investor partners and the Partnership. [16]
*91 To decide whether the Partnership's transactions were shams, we examine both (1) its subjective business purpose and (2) the objective economic substance of the transactions. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990) (computer-lease case in which transactions were held to be economic shams), affg. T.C. Memo. 1987-628, affg. Moore v. Commissioner, T.C. Memo. 1987-626, affg. Sturm v. Commissioner, T.C. Memo. 1987-625, affg. in part and revg. in part Larsen v. Commissioner, 89 T.C. 1229 (1987). This two-part test is used as a way of determining "whether the transaction had any practical economic effects other than the creation of income tax losses." Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985). [17]
*92 A. Lack of Economic Substance
"A transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits." Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986). The various factors that Levy v. Commissioner, 91 T.C. at 856, found to be particularly significant in determining whether a computer leasing transaction possesses economic substance are the presence or absence of arm's-length price negotiations, the reasonableness of the income and residual value projections, the structure of the financing, the degree of adherence to contractual terms, and -- most important in this case -- the relationship between the sale price and fair market value of the property acquired. Although the parties in the case at hand have stipulated that the Arrowhead property had a value as a residence that did not exceed $ 150,000, they advance diametrically opposed views on the relationship between the price paid by the Partnership and the value of its purchased interests. The Partnership purported to obligate itself to *93 pay the Strebels $ 31,200 for each one-tenth timeshare interest in the property, which would translate into a total price of $ 312,000. However, petitioner claims that the creation of the timeshare interests purchased by the Partnership caused the combined value of those interests to be considerably more than both the value of the fee value in the residence and the price paid by the Partnership for the timeshare interests: $ 442,000 in 1983 as estimated by petitioner's expert in 1987. [18] Respondent not only denies that the timeshare value of the property could exceed the $ 150,000 highest value of the fee interest in the residence; respondent also argues that the Partnership's purchased interests consisted of something that was much less valuable than conventional timeshares: the purchase agreements between the Partnership and the Strebels were for "undivided fractional interests in common tenancy in real property at the resort site." We *94 agree with respondent. What the Partnership acquired from the Strebels was much less, not more, than a full fee interest. It was burdened most notably by the mortgage that the Partnership took subject to. Moreover, whatever the property may have been worth to the Partnership under the arrangements at issue, petitioner provided no credible explanation why the Partnership should have had to pay more for the property than its value as a residence. Petitioner's and intervenor's explanation -- that the Strebels were entitled to additional compensation for the risk that the Partnership would not find enough limited partners to buy all the fractional interests, so that the Strebels might be left with a part interest in the property that would be worth little to them -- might justify a premium for the interests initially sold, but it does not support a continuation of the premium as the total price approached and then exceeded the value of the house as a residence. Respondent is correct in stressing that there was no bargaining between the Strebels and the Partnership on the price to be paid for the interests. The terms were dictated by the party that should have found them extremely *95 disadvantageous, namely, the Partnership. Mr. Knox insisted on contracting for a grossly inflated price, and the only credible explanation is his desire to create tax benefits through inflated interest deductions. The parties disagree in the same vein on the fair market value of the interests created in transactions between the Partnership and the limited partners. Again, respondent persuades us. The limited partners received nothing remotely approaching the bundle of rights and attendant values of conventional timeshares. [19] During the first year of their participation in the Partnership, they received only the opportunity of reserving one 3-day weekend being guaranteed). The offering memorandum stated that the Partnership expected to offer the same opportunity in future years, but it guaranteed nothing. Occupancy rates for rental properties in the Lake Arrowhead area in the years in issue ranged from 20 percent to 30 percent, and the rental value of the property in question from 1983 through 1987 was between $ 400 and $ 900 for a week. The price the Partnership purportedly paid the Strebels for each 1/52 share of the property was $ 6,000. [20] This price may appear comparable *96 to the figure of between $ 5,000 and $ 6,000 that it cost at the time to purchase a fee interest of a week in similar timeshare property in the Lake Arrowhead area. However, as respondent stresses, what the limited partners bought was different from and much less than a 1-week timeshare fee interest. First, although there was a possibility that the Partnership would allow them to spend 4 additional weekdays during the first year and that they would have similar opportunities in future years, they only had an enforceable right to spend one 3-day weekend during the first year. [21] Second, even in that first year, the 7 days were fragmented: one 3-day weekend and at least two separate periods of weekdays. An interest of this sort is so much less valuable than a straight week of occupancy of comparable property at Lake Arrowhead as to be virtually unmarketable. For their use of the property the limited partners were supposed to pay $ 2,500 per year for the first 5 years, which was grossly excessive. Although after the first 5 years they would have to pay only $ 250 each year for the 7 days if the Partnership chose to offer the 7 days to them, the payment would be $ 250 "in '1983 *97 dollars'", i.e., adjusted for inflation and probably roughly equal to the cost of such rentals in the open market. *98 Our conclusion that these transactions lacked economic substance is strengthened by other considerations. There is no evidence of any bargaining between the limited partners and the Partnership. What the limited partners were primarily paying for was tax benefits (albeit with an ancillary speculative vacation opportunity). The projections used by the Partnership were thoroughly unreasonable; there was no hope that the balloon payment (three-quarters of the price magnified by enormous interest accruals) would be made from the income of the Partnership unless (1) the required deposits were made to the reserve fund and (2) the Partnership could achieve the projected 13.6 - percent rate of annual investment return. However, there was no source provided for the deposits into the fund: virtually all the initial payments of $ 12,500 over the first 5 years by each of the limited partners were to be -- and were -- diverted to the Strebels and Mr. Knox. In a purported effort to meet the Partnership's contractual obligations to the Strebels, Mr. Knox eventually assigned to the reserve fund promissory notes of dubious value. There is no reason to think that he had any hope then (or has *99 any hope now) of achieving the heroic rate of investment return provided for by the Property Purchase Agreements with the Strebels and the Partnership Agreement. Thus, the Partnership's transactions lacked economic substance at both levels. B. Lack of Business Purpose
The second part of the test used in Casebeer v. Commissioner, 909 F.2d at 1363, for determining whether a transaction is a sham is the business purpose test. Whether a profit objective exists is decided at the partnership level. Karr v. Commissioner, 924 F.2d 1018, 1023 n.4 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988); Polakof v. Commissioner, 820 F.2d 321, 323 (9th Cir. 1987), affg. T.C. Memo. 1985-197. This Court has recently discussed this subjective business-purpose test. Peat Oil & Gas Associates v. Commissioner, 100 T.C. 271 (1993), affd. sub nom. Ferguson v. Commissioner, 29 F.3d 98 (2d Cir. 1994). Whether the participants must have profit as their "primary purpose", *100 or whether it suffices that they have an "actual and honest" profit objective, does not matter. In the case at hand, petitioner and intervenor have shown neither. Profit motive is determined at the partnership level, and for limited partnerships the criterion is whether the general partner sought to make profits for the partnership. Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Polakof v. Commissioner, supra at 323. Mr. Knox, a "financial planner" with a law degree, was arguably more sophisticated than the limited partners. He claims that the Partnership intended to make profits, but his claims are incredible. The Partnership's only potential sources of income were rental payments received from limited partners, receipts from public rentals, and investment income. Public rentals were possible only if the limited partners did not take advantage of their rights to occupy the property in accordance with the resort privileges that they had purchased. Such rentals -- the only conceivable source of current income -- were only made sporadically by the Partnership *101 or, rather, by Mr. Knox on his own behalf; [22] they are recorded for 2 of the years in question in this case, and for 2 later years, and for each year the receipts were approximately $ 2,000, [23] a pittance in comparison with the enormous annual losses that the Partnership was claiming. Thus, the Partnership's transactions with both the Strebels and the limited partners had no business purpose. [24] These transactions therefore fail both parts of the test in Casebeer v. Commissioner, supra.
*102 C. LaVerne and Ames Parallels
The transactions that figured in our Ames[25] *103 and LaVerne[26] decisions were the Kilburn and Admiral Beach timesharing schemes, which furnished many of the ideas that Mr. Knox used to paper his Arrowhead Mountain Getaway scheme. Both those prior schemes provided for the leveraged "purchase" of vacation property through limited partnerships, tenancies in common, [27] nonrecourse long-term "loans" with enormous balloon payments at the end of the 30- or 40-year loan periods, an accounting method for the interest on the "debt" that resulted in enormous frontloading of deductions claimed by the limited partners, [28] and inflated values of the interests "sold". As the later and more developed of the two prior schemes, Admiral Beach had additional similarities with the Arrowhead Mountain Getaway program: The "loans" were nonrecourse as to the partners but ostensibly recourse as to the partnership; the balloon payments were ostensibly to be made from partnership "reserve funds" (which in the Admiral Beach case -- and arguably in the case at hand -- were never established); and the limited partnership agreements specifically provided that the partnership guaranteed a "Reservation Privilege" only for the first year. As a *104 result, if a limited partner should ever fail to buy a subsequently offered reservation privilege, the Partnership could buy back his interest for a nominal amount, partnership interests could not be sold or transferred, and there was no potential for economic gain by the limited partners. [29]
In Ames and LaVerne, we decided (and were affirmed by the Court of Appeals for the Ninth Circuit, among others) that the Kilburn and the Admiral Beach programs were sham transactions. As a result, essentially all the deductions at issue were denied. [30]
*105 Petitioner and intervenor try to distinguish the Arrowhead Mountain Getaway program from the Kilburn and Admiral Beach programs. They assert that Arrowhead Mountain Getaway differs from Kilburn because the Partnership and the limited partners paid reasonable prices for their purchased interests and because the Partnership will be able to pay its obligations. However, we have concluded that these assertions are incredible. Petitioner attempts to distinguish Arrowhead Mountain Getaway from Admiral Beach by emphasizing that the Limited Partnership Agreement as orally amended (as well as the Certificate of Limited Partnership filed with the county recorder [31]) allows limited partners to receive income from their reservation periods if the Partnership rents them to others as well as to receive a share of the Partnership's other profits. But petitioner has proffered no evidence that the Partnership received any such income on behalf of the limited partners or that there was or is even a remote possibility that such income would be received by the limited partners. *106 The other main difference that petitioner claims -- that limited partners actually used the Arrowhead property because it was so conveniently located -- is real; limited partners did stay at the property for up to 194 days a year. One limited partner testified that he was satisfied with his stays and a second that he intended to make personal use of the property and did so. But any benefit they derived from such use did not create partnership income and does not endow the Partnership's transactions with economic substance. Cf. Moss v. Commissioner, 758 F.2d 211 (7th Cir. 1985), affg. 80 T.C. 1073 (1983). The issue of economic substance, like the issue of business purpose, is decided at the partnership level for limited partners. Estate of Ravetti v. Commissioner, T.C. Memo. 1994-260; cf. Polakof v. Commissioner, 820 F.2d 321 (9th Cir. 1987) (holding that determinations about profit objective under section 162 are to be made at the partnership level, and depend on whether general partner sought to make profit on behalf of the partnership); Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993) *107 (following Polakof position that "profit [of the partnership] must be the predominant, primary or principal objective of the general partner"); Brannen v. Commissioner, 722 F.2d 695, 703 (11th Cir. 1984) (holding that determinations about profit motive under section 183 are to be made at the partnership and not the partner level), affg. 78 T.C. 471 (1982). Thus, this case does not differ materially from the Ames and LaVerne cases, which are dispositive, factually and legally, of our conclusion that the transactions between the Partnership and the Strebels and between the Partnership and the limited partners were economic shams. [32]
*108 A melange of ancillary features of the Arrowhead Mountain Getaway program supports the conclusion that its transactions were shams. Mr. Knox was notably careless and unbusinesslike in documenting and altering the legal relationships of the Partnership with the limited partners. He showed himself quite ready to accept and use obligations associated with the dealings of sham or dubious programs: many investors made their down payments with Kilburn and Admiral Beach notes; the Reserve Fund was funded with notes from Investment Engineers. [33] We have seen that there were many respects in which Messrs. Knox and Strebel treated the Arrowhead property as belonging to themselves and Mr. Knox treated the Partnership as his alter ego. *109 D. Interest Deductions Disallowed
From our finding that these transactions were economic shams it follows that the "management", "legal", "operational", and "self-employment" expenses claimed by the Partnership are not deductible. Although expenses incurred in connection with a sham transaction are generally not deductible, Karr v. Commissioner, 924 F.2d at 1023, some cases do "indicate that, in some circumstances, a sham transaction may have separable, economically substantive, elements that give rise to deductible interest obligations", United States v. Wexler, 31 F.3d 117, 127 (3d Cir. 1994) (citing Jacobson v. Commissioner, 915 F.2d 832 (2d Cir. 1990), affg. in part and revg. in part T.C. Memo. 1988-341; Rice's Toyota World v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Lieber v. Commissioner, T.C. Memo. 1993-424). However, as this Court's opinion in Lieber v. Commissioner, supra, *110 indicates, there is also authority for the contrary position, that "an [interest] deduction is not allowed where the taxpayer lacks a tax-independent purpose." Id. (citing Sheldon v. Commissioner, 94 T.C. 738, 759 (1990)). Indeed, in Lieber v. Commissioner, supra, this Court, rather than expressly adopting Jacobson, merely applied it under the Golsen doctrine [34] because appeal lay to the Court of Appeals for the Second Circuit, which had decided Jacobson v. Commissioner, supra, for the taxpayer. The potential disagreement has no significance here: the "loans", instead of being separable from the sham transactions, were an integral part of the transactions between the Partnership and the Strebels, and were the driving force of the tax-avoidance scheme, rather than merely tangential aspects of the dealings among the parties. As a result, the "loans" are themselves shams and must be disregarded for tax purposes. *111 There is an alternative sufficient ground for disallowing the interest deductions in their entirety. As this Court's opinion in Lieber also makes clear, "for interest to be deductible under section 163(a), the underlying indebtedness must be genuine. E.G., Knetsch v. United States, 364 U.S. 361 (1960)." The indebtedness here was not genuine. In Ames v. Commissioner, T.C. Memo. 1990-87, our rationale for disallowing the interest deductions claimed was that there was no genuine indebtedness: the loan being nonrecourse, in order for the debt to be genuine, the purchaser would have had to have an "economic incentive to pay off the unpaid purchase price." This requirement was not satisfied "because the purchaser will never obtain any equity in the property." Id. In upholding this result, the Court of Appeals for the Ninth Circuit held that no interest could be deducted because the debt "[lacked] economic substance" and cited with approval Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), the primordial case denying *112 a tax deduction for interest on a nonrecourse debt that at its inception substantially exceeded the value of the property securing the debt. [35]Hildebrand v. Commissioner, 967 F.2d 350, 352 (9th Cir. 1992), affg. Ames v. Commissioner, T.C. Memo. 1990-87. With respect to the Admiral Beach program, this Court in LaVerne v. Commissioner, 94 T.C. 637 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without *113 published opinion 956 F.2d 274 (9th Cir. 1992), found that the transactions were shams, with the result that the interest deductions were not allowable. [36] The Court of Appeals for the Ninth Circuit, affirming in an unpublished opinion our decision in LaVerne, made the following observation: The loans taken by the partnership, although ostensibly recourse as to the partnership, were nonrecourse as to the taxpayers. Thus, the taxpayers were not personally liable for the loans. Because the underlying transaction is a sham and the taxpayers did not incur any genuine debt due to the non-recourse nature of their obligation, the interest on these loans is not deductible. See Bail Bonds, 820 F.2d at 1549.
The observations of all these courts, particularly the Court of Appeals for the Ninth Circuit, about the indebtedness in the Kilburn and Admiral Beach schemes, apply equally to the Arrowhead Mountain Getaway program. In Arrowhead Mountain Getaway, the indebtedness was nonrecourse as to all the partners, including the general partner, the balloon payment to be made in the future would always represent by far the *114 larger part of the debt until it was paid, the value of the real property (except under petitioner's inflated valuation) would always be less than the remainder of the debt to be paid, and the value of the Partnership's interest in the property would be still smaller, particularly in view of the fact that it was still subject to a third-party mortgage, so that it would never be economically rational to pay that remainder. Consequently, there was never any genuine indebtedness and there can be no deductions for interest. Petitioner has not borne her burden of proving any of the Partnership's claimed deductions; we therefore sustain respondent's disallowance of all deductions claimed by the Partnership. E. Gross Rental Income and Receipts
*115 There are strong grounds for doubting that the rentals to the public were made by the Partnership. Rental payments apparently went to Mr. Knox and Mr. Strebel, who in many ways treated the property as their own, rather than the Partnership's. Mr. Knox commingled his money and the Partnership's. He attempted to "restructure" the Partnership in 1987 into a partnership of four sub-tier partnerships, but never succeeded in filing his restructuring papers with the county and State authorities, and does not appear to have succeeded in making the limited partners understand what he was trying to do. Mr. Strebel continued to make occasional use of the property. Ostensibly to meet the contractual requirements for establishing a reserve fund, Mr. Knox had the Partnership assign its interests in promissory notes payable to Mr. Knox related to another project/limited partnership. Mr. Knox acting for himself, Mr. Knox acting in the Partnership's name, and the Strebels were quite free and easy in exchanging the Arrowhead property and an adjoining parcel; since September 26, 1991, legal title to the Arrowhead property has belonged to the Strebels. These are all additional reasons for disregarding *116 the purported transactions in this case. From the fact that the transactions between the Partnership and the limited partners were shams, it follows that the Partnership received no taxable income from such transactions. [37] The amounts received by the Partnership through these transactions with the limited partners must therefore be subtracted from the income that the Partnership reported for the years at issue and the Partnership's taxable income thereby reduced. Conclusions
Respondent's disallowance of petitioner's interest deductions because of the method of accounting used is sustained. We find the Partnership's transactions, both with the Strebels and with the limited partners, to be sham transactions, and the purported loans by the Strebels to the Partnership not to be loans at all. *117 As a result, we sustain respondent's disallowance of all the Partnership's claimed deductions (with allowance made for the arithmetical error in computing rental expenses for 1985, see supra p. 26). We hold the Partnership's purported gains and losses all to be unreal. As a result, we hold that all the Partnership's purported capital gains, "gross rents", and "gross receipts" do not exist and are not taxable income. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Under sec. 301.6231(a)(2)-1T, Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6790 (Mar. 5, 1987), petitioner is deemed a "partner" in the Partnership by virtue of having filed joint income tax returns with intervenor for the taxable years at issue. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The FPAA's state that the claimed capital gains did not represent either capital gains or ordinary income, with the result that the partners would "not be required to report that income on their income tax returns."↩
3. The Kilburn program was the subject of Ames v. Commissioner, T.C. Memo. 1985-443, and Ames v. Commissioner, T.C. Memo. 1990-87, and the Admiral Beach program was the subject of LaVerne v. Commissioner, 94 T.C. 637 (1990). For the histories of these cases in various Courts of Appeals, see infra↩ notes 25 and 26.
4. For this first Property Interest Purchase Agreement signed on Dec. 31, 1983, that date was Dec. 31, 2023. The same clause also included a provision that accelerated the date when payment was to be made, if the prime rate was sufficiently high.↩
5. On the more plausible assumption that this figure of $ 358,800 was per property interest (so that the total for the whole Arrowhead property would be $ 3,588,000), the final value could be achieved if net annual appreciation of 13.6 percent could be attained.↩
6. "Getaway Packages" are described infra↩ p. 14.
7. As we shall see, limited partners could buy further Resort Privileges in later years if the Partnership offered them.↩
8. The IRS imposed the freeze pursuant to Rev. Proc. 84-84, 1984-2 C.B. 782 (authorized by secs. 301.6231(c)-1T and 301.6231(c)-2T, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 48537-48539 (Dec. 13, 1984), themselves authorized by I.R.C. sec. 6231(c)(3)), which labeled as abusive tax shelters partnerships where it was highly likely that there was "(1) [a] gross valuation overstatement, or (2) [a] false or fraudulent statement with respect to the tax benefits to be secured by reason of holding an interest in the partnership". Sec. 301.6231(c)-1T, Income Tax Regs., supra↩.
9. This agreement states that on Dec. 30, 1987, the Strebels executed a deed of trust conveying the Arrowhead property to Michael Schoeny as trustee.↩
1. The Partnership reported this total of $ 1,041,391, presumably as a result of an arithmetical error. The correct total is $ 1,036,675.↩
10. See Young, "The Role of Motive in Evaluating Tax-Sheltered Investments", 22 Tax Law. 275 (1969). The case at hand and the recent cases on the Rule of 78's also bear out Young's prediction that an examination of accounting methods of tax shelters would turn out to be an important means of disallowing them. Id.↩ at 306-307.
11. Thus, the economic accrual for the Partnership's 1983 taxable year was 13.6% x [$ 0 [previous year's indebtedness] + (10 [number of units purchased in current year] x $ 4,500 [deferred payment per unit])] = 13.6% x $ 45,000 = $ 6,120. Its economic accrual for 1984 was 13.6% x [$ 51,120 [previous year's indebtedness] + (29.5 [number of units purchased in current year] x $ 4,500 [deferred payment per unit])] = 13.6% x $ 183,870 = $ 25,006. And so on. See table supra↩ p. 27.
12. Under the Rule of 78's method of accounting, the total amount of interest to be allocated during the life of the loan is multiplied by a fraction whose numerator is the number of remaining loan periods until maturity and whose denominator is the sum of this number for each of the loan periods of the life of the loan. Thus, if a loan is for 1 year and the loan periods are months, the 1st month will have allocated to it 15.2% (= 12/78 = 12 [number of months until maturity] / [12 + 11 + 10 + 9 + 8 + 7 + 6 + 5 + 4 + 3 + 2 + 1]) of the total interest over the whole year, and the 12th and last month will have 1.3% (= 1/78) allocated to it. This method frontloads interest in a more radical way than the straight-line method of accounting used in this case: the Rule of 78's actually apportions larger amounts of interest to earlier years, whereas Mr. Knox's straight-line method apportions identical amounts to all the years of the term. The use of the Rule of 78's was prohibited starting on Dec. 29, 1982, by Rev. Rul. 83-84, 1983-1 C.B. 97, permitted for short-term consumer loans by Rev. Proc. 83-40, 1983-1 C.B. 774, and held subject to alteration by the Commissioner for all long-term transactions by Prabel v. Commissioner, 91 T.C. 1101 (1988), affd. 882 F.2d 820↩ (3d Cir. 1989).
13. For the precise figures, see table supra↩ p. 27.
14. Petitioner has cited in passing, but does not seem seriously to rely on, James Bros. Coal Co. v. Commissioner, 41 T.C. 917 (1964), in which the taxpayer was compelled to compute its accrued and deductible interest by using the straight-line method. James Bros. is very different from the case at hand: there, the term of the debt was only 3 years, and the method that was disallowed was the Rule of 78's. In any case, James Bros. has to be viewed in the context of the era in which it was decided. Cf. Canellos & Kleinbard, "The Miracle of Compound Interest: Interest Deferral and Discount After 1982", 38 Tax Law Rev. 565, 580-584↩ (1983).
15. Courts often distinguish between "factual shams", transactions which in fact never occurred, and "economic shams" (sometimes called "shams in substance"), transactions which occurred but which lacked economic substance. Horn v. Commissioner, 968 F.2d 1229, 1235-1236 (D.C. Cir. 1992), revg. T.C. Memo. 1988-570; Cook v. Commissioner, 941 F.2d 734 (9th Cir. 1991), affg. 90 T.C. 975 (1988); Krumhorn v. Commissioner, 103 T.C. 29, 37, 46↩ (1994).
16. Respondent does not contest the Partnership's legal status as a limited partnership. Copies of the Partnership's Certificate of Limited Partnership seem to have been filed with the secretary of state of California as well as with the county recorder of San Bernardino County. If they were, Cal. Corp. Code sec. 15621 (West 1991) was apparently satisfied, and the Partnership thereby became a valid limited partnership under California law. The failure to resubmit the Articles of Limited Partnership for the four sub-tier partnerships to the California secretary of state after they were returned by him to Mr. Knox apparently means that Cal. Corp. Code sec. 15622↩ (West 1991) was not satisfied, so that the sub-tier partnerships never achieved legal status as limited partnerships. In this opinion, the problematic legal status of the sub-tier partnerships is ignored, and "the Partnership" refers only to Arrowhead Mountain Getaway, Ltd.
17. Not all the U.S. Courts of Appeals have been equally clear on this point, but this case is appealable to the Court of Appeals for the Ninth Circuit. That court stated at the passage quoted in Sochin that it had not meant to suggest in Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23, that there was a rigid requirement for a transaction to fail both tests -- both the subjective business-purpose test and the objective economic-substance test -- for it to be a sham. Sochin v. Commissioner, supra at 354. This Court's understanding of current Ninth Circuit doctrine is usefully summarized in Estate of Ravetti v. Commissioner, T.C. Memo. 1994-260↩.
18. This expert and respondent's valuation expert both testified at trial.↩
19. Conventional timeshares are of two forms: (1) Interval ownership, which in theory lasts forever (i.e., is repeated every year forever), and (2) right to use, which is for a (long) term of years. Trowbridge, Resort Timesharing 34-37 (1981). It is true that the weeks (or terms of whatever length) that are bought need not occur at the same time every year. As Trowbridge describes, they can be floating, id.↩ at 39, but they are available at some time during every year of the term, which either is unlimited or lasts for several years.
20. As throughout our discussion, it should be borne in mind that only one-fourth of that price was even ostensibly paid, and the rest was not due to be paid until 40 years later.↩
21. On this point of lack of guarantees, petitioner attempts to argue that the reference to the sales materials in the Agreements of Purchase signed by new limited partners at the same time that they signed their Limited Partnership Agreements implies that those materials' references to 30 years of vacations in the future were incorporated into the agreements. This is unpersuasive: there is no ambiguity in the Limited Partnership Agreements such that a court might interpret the contracts to the detriment of the Partnership: the Agreements of Purchase which they explicitly incorporated are quite definite about the lack of guarantees. Moreover, the Partnership could not make any guarantees about future years, since it committed itself not to do so in its Property Interest Purchase Agreements with the Strebels. Finally, even if there may have been a possibility or even a probability that a court would find for the limited partners on this issue, the fact that litigation might be necessary would reduce the value of the partners' interests substantially. Cf. Estate of Newhouse v. Commissioner, 94 T.C. 193, 245 (1990); Estate of Mueller v. Commissioner, T.C. Memo. 1992-284↩.
22. Receipts were forwarded by the brokers with whom Mr. Knox and Mr. Strebel entered into a brokerage agreement as owners of the property to Mr. Knox personally, and also to Mr. Strebel.↩
23. 1985: $ 2,103.50; 1986: $ 1,743; 1990: $ 1,815; 1992: $ 2,400.↩
24. The nonexclusive list of nine factors for determining the presence or absence of a profit motive listed in sec. 1.183-2(b), Income Tax Regs., has often been used for determining the presence or absence of a business purpose in an alleged sham. Hildebrand v. Commissioner, 28 F.3d 1024, 1027 (10th Cir. 1994), affg. Krause v. Commissioner, 99 T.C. 132 (1992); Smith v. Commissioner, 937 F.2d 1089, 1093 (6th Cir. 1991), revg. 91 T.C. 733 (1988); Campbell v. Commissioner, 868 F.2d 833, 836 (6th Cir. 1989), affg. in part, revg. in part, and remanding T.C. Memo. 1986-569↩. A detailed examination of these factors would result in a decision against petitioner. Factor (6) (taxpayer's history of income or losses with respect to activity) in particular weighs heavily against petitioner.
25. Ames v. Commissioner, T.C. Memo. 1990-87, affd. without published opinion 937 F.2d 616 (10th Cir. 1991), affd. sub nom. Lukens v. Commissioner, 945 F.2d 92 (5th Cir. 1991), affd. without published opinion sub nom. Chesser v. Commissioner, 952 F.2d 411 (11th Cir. 1992), affd. without published opinion sub nom. Waren v. Commissioner, 958 F.2d 370 (4th Cir. 1992), affd. sub nom. Hildebrand v. Commissioner, 967 F.2d 350↩ (9th Cir. 1992).
26. LaVerne v. Commissioner, 94 T.C. 637 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274↩ (9th Cir. 1992).
27. Although in the Kilburn case this was eventually altered to a licensor/licensee relationship.↩
28. Admiral Beach/LaVerne used the Rule of 78's. With a slight twist, this was also the method of accounting used in Kilburn/Ames↩.
29. The Arrowhead Mountain Getaway program had all of these characteristics, although the last two provisions mentioned in the Limited Partnership Agreements -- that shares could not be transferred and that the limited partners had no potential for economic gain -- were quickly rescinded by Mr. Knox. However, these changes were made so informally as to cast doubt on their validity.↩
30. In Ames↩, depreciation deductions were allowed to the extent of actual gross income.
31. But no amendment to the certificate of limited partnership was ever filed either with the county recorder or with the secretary of state.↩
32. This is not to say that the public rentals, few as they were, were also economic shams. They were not. As far as they are concerned, however, the evidence supports the conclusion that Mr. Knox in his personal capacity, possibly along with one or both of the Strebels, rather than the Partnership conducted those rentals and derived the economic benefits therefrom.↩
33. Investment Engineers has not yet been found to be a sham and there is not sufficient evidence in this record for us to find it to be a sham, but its nature is currently at issue in a case before this Court. Investment Engineers, Ltd. v. Commissioner, T.C. Memo. 1994-255↩ (rejecting petitioner's motion to dismiss on statute-of- limitations grounds).
34. The doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), which was recently elaborated in Lardas v. Commissioner, 99 T.C. 490↩ (1992), is that this Court will apply the precedents of a Court of Appeals to which appeal lies where they are squarely on point.
35. A statement of the Court of Appeals for the Ninth Circuit in Estate of Franklin v. Commissioner particularly fits the case the hand: "[it] is no longer true [that debt is bona fide] when it appears that the debt has economic significance only if the property substantially appreciates in value prior to the date at which a very large portion of the purchase price is to be discharged." 544 F.2d at 1049↩.
36. As we have seen supra p. 31, this Court in LaVerne↩ also made an alternative holding disallowing the interest deductions claimed by the Admiral Beach program by reason of the failure properly to reflect income of its method of accounting using the Rule of 78's.
37. Respondent implicitly conceded this point by expunging the claimed capital gains reported by the Partnership for 1986 and 1987 on the ground that the Partnership's transactions were shams and lacked economic substance.↩