CECIL H. AND JESSIE MAY SHIRAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
SHIRAR v. COMMISSIONER
Docket No. 15980-85.
United States Tax Court
T.C. Memo 1987-492; 1987 Tax Ct. Memo LEXIS 488; 54 T.C.M. (CCH) 698; T.C.M. (RIA) 87492; September 28, 1987. Eric Olson and Shahen Hairapetian, for the petitioners. Ross W. Paulson, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' 1979 and 1980 Federal income taxes in the amounts of $ 28,268 and $ 22,932, respectively. The issues for decision are whether petitioners are entitled to deduce $ 10,000 as a worthhless debt for the 1979 tax year, and whether petitioners are entitled to deduct alleged interest incurred with respect to the purchase of a life insurance policy for each of the tax years 1979 and 1980. [1]
*490 Some of the facts were stipulated and are so found. Petitioners resided in Newport Beach, California at the time the petition herein was filed. Bad Debt Deduction
In May 1979, Harold Shirar ("Harold") petitioner-husband's brother, requested a loan of $ 2,000 to enable him to begin a mail order business. Subsequently, Harold requested an addition loan of $ 8,000. Harold and his wife Edna executed three promissory notes in favor of petitioners in the amounts of $ 2,000, $ 3,000 and $ 5,000 on May 30, July 17 and July 25, respectively. Each note carried an interest rate of ten percent, payable monthly, and was due in 24 months. Harold Shirar was in poor health at the time petitioner made the loans, and his health continued to deteriorate. Harold made four interest payments on the notes in 1979, as follows: Date of Payment
Amount
July 24
$ 43.90
August 4
28.00
September 1
106.25
September 30
106.25
No payments were made on any of the notes after September 30, 1979. On November 5, 1979 in a letter to petitioner Harold informed petitioner that the mail order business had failed and that he was unable to repay the notes. At that time, *491 neither Harold nor Edna was employed, and they had only minimal assets and income. Petitioner was aware of their financial condition and made no attempts to collect the amounts due on the notes. Petitioner designated the transaction a nonbusiness bad debt and claimed a short-term capital loss of $ 10,000 on his 1979 tax return. Respondent disallowed the loss entirely. Interest Expense
In 1978, petitioners consulted with their C.P.A. who estimated that petitioners' estate tax liability would be approximately $ 700,000 at the death of the first of the petitioners to die. Petitioner did not want to be forced to liquidate their assets to pay the estate taxes which would be due. Therefore, they decided to purchase life insurance policies to provide a ready source of cash. Petitioner-husband purchased a policy on the life of his wife and designated himself as beneficiary. The policy consisted of two components: "Initial Face Amount" coverage of $ 500,000 and "Ultimate Face Amount" coverage of $ 2,000,000. [2] In the event of death prior to the insured's 70th birthday, the policy provided a death benefit of the "Initial Face Amount of $ 500,000 plus the net cash value of *492 the Ultimate Face Amount." The net cash value of the Ultimate Face Amount equaled the cash value less any policy loans. In the event of death after the insured reached age 70, the Ultimate Face Amount of $ 2,000,000 would be paid. The policy loan agreement provided that in the event of death prior to full payment of the loan, the outstanding amount of the loan plus interest would be deducted from any settlement proceeds of the policy. At the time they discussed purchasing the policy with the insurance agent, petitioners received a computer printout which outlined the financial aspects of purchasing the policy by borrowing the cash value. A facsimile of the printout is attached as Appendix A. The printout detailed the total cash value, total loan amounts, annual premiums, interest, gross outlay, annual loan, net outlay, tax savings assuming a 50 percent tax bracket, after tax outlay, net cash value annual increase, net total cash value and net *493 death benefit payable projected for each of the 14 years until the insured reached age 70 and the policy was paid up. During the years in issue, in the event of the death of the insured, the net death benefits petitioners would have received were $ 500,000 in 1979 and $ 511,594 in 1980. If petitioners kept the policy in effect until the insured reached age 70, the net death benefit payable at that time would have been $ 708,138. The premiums for the Initial Face Amount portion of the policy were $ 13,180 per year for 14 years. (The policy was to be paid up at age 70, and petitioner-wife was 56 when the policy was purchased.) The premiums for the Ultimate Face Amount were payable at any time, provided they were fully paid by the time the insured reached age 65. In the year they purchased the policy, petitioner paid the premium for $ 1,500,000 of Ultimate Face Amount coverage at a cost of $ 717,915. Petitioner planned to pay the remaining premium due for an additional $ 500,000 of coverage when petitioner-wife reached age 65 at a cost of $ 326,145. Petitioners' total premium for the first year was $ 731,095 (Initial Face Amount premium of $ 13,180 plus Ultimate Face Amount *494 premium of $ 717,915). Petitioner borrowed the cash value of the Ultimate Face Amount from the insurance company to pay the premium due. The cash value was $ 717,915. Interest on the loan amounted to $ 43,075 for 1978. The premium for the second year was $ 13,180. Petitioner borrowed an additional $ 25,127 from the insurance company, an amount equal to the increase in the cash value of the Ultimate Face Amount. The interest due on the total loan amount in the second year was $ 44,583. Likewise, the premium for the third year was $ 13,180. Petitioners again borrowed the increase in the cash value of the Ultimate Face Amount portion of the policy in the amount of $ 14,413. Total interest due on the loan was $ 45,447 in 1980. No cash or checks were exchanged between petitioners and the insurance company in connection with these loans. Rather, it appears the transactions were accomplished through bookkeeping entries. However, petitioners did write checks to he company for interest payments. During the fourth year of the policy, Congress changed the estate tax laws to provide for an unlimited marital deduction. (See section 2056; [3] see section 405, Economic Recovery Tax *495 Act of 1981, 95 Stat. 172, 301.) As a result of these changes, petitioners determined that they no longer required a source of cash at the time of the first to die. Therefore, petitioner made no payments on the policy in 1981 and surrendered the policy in January of 1982. At that time, petitioners received the net cash surrender value from the insurance company in the amount of $ 11,594. Respondent disallowed petitioners' interest deductions of $ 44,583 and $ 45,447 in 1979 and 1980, respectively. OPINION Respondent challenges petitioners' claim to a loss from the worthlessness of a nonbusiness debt on the grounds that the advances constituted gifts rather than loans, and, in the alternative, that petitioners failed to establish that the debt became worthless in 1979.
Section 166(d) allows a deduction for a nonbusiness debt which becomes worthless within the taxable year, but provides that the loss shall be treated as a short-term capital loss. To qualify for a deduction for a worthless debt, the taxpayer must first show *496 the existence of a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec.1.166-1(c), Income Tax Regs.Transactions among family members are subject to careful scrutiny. Estate of Van Anda v. Commissioner,12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951). Furthermore, the taxpayer must show that there existed at the time of the transaction an intent to enforce collection of the indebtedness and that some event occurred, during the year in which the deduction is sought, which rendered the debt uncollectable. Andrew v. Commissioner,54 T.C. 239, 245 (1970). We conclude that petitioners' advances to Cecil constituted loans rather than gifts. The indebtedness was evidenced by notes signed by the debtors which provided for interest payable monthly, and Cecil in fact paid the monthly interest due. We are further persuaded by the testimony of petitioner-husband and his brother that they intended the transactions to be loans. Petitioners' failure to make formal collection demands or take legal action, under these circumstances, is not fatal to his *497 claim for a deduction. Sherman v. Commissioner,18 T.C. 746, 752 (1952); sec. 1.166-2(b), Income Tax Regs.
Respondent makes much of Cecil's poor health at the time of the transactions and of a remark by Cecil that the debt was to be repaid from receipts of the business. Respondent argues that this suggests the debt was contingent upon the success of the business and that such success was unlikely under the circumstances. Cecil's poor health was not the cause of the failure of the business and the consqeuent worthlessness of the debt. On the contrary, Cecil selected a business endeavor in which his poor health would not unduly handicap him. It appears that the business failure was due primarily to adverse publicity over which Cecil had no control. Furthermore, we do not agree with respondent's contention that the debt was contingent because the parties contemplated that repayment would come from the proceeds of the business. Although that was Cecil's only source of income at the time, nothing in the record suggests that he was obligated to make repayments only from that source. See *498 Andrew v. Commissioner, supra at 245. Finally, petitioners must establish that the debt became worthless in 1979. The record shows that on November 5, 1979, Cecil informed petitioners that he would be unable to repay the debt. Petitioner-husband made inquiries about Cecil's financial condition and determined that there was no likelihood of recovering his money. We conclude that such a determination was reasonable under the circumstances. Formal collection efforts or demands for payments would have served no purpose. There was no indicated that Cecil's financial condition would take a turn for the better. Accordingly, there was no reason for petitioners to postpone declaring the debt worthless. Therefore, we hold that petitioners are entitled to claim a deduction for the worthless debt in 1979. Respondent advances three alternative theories in support of his position that the claimed interest deductions must be disallowed. First, respondent argues that petitioners are not entitled to the deductions because the amounts paid were not interest on a true indebtedness. Alternatively, respondent asserts that the interest deductions should be disallowed under *499 section 264(a)(2) which prohibits deductions for amounts paid on indebtedness incurred to purchase a single premium life insurance contract. Finally, respondent argues that the deductions are not allowable because of section 264(a)(3) which denies deductions for amounts paid on indebtedness incurred to purchase a life insurance contract pursuant to a plan of purchase which contemplates the systematic borrowing of part or all of the increases in cash value of such contract.
Section 163 provides a deduction for all interest paid or accrued within the taxable year on indebtedness. Sec. 163(a). It is well established that to be deductible, interest must be paid on genuine indebtedness; that is, indebtedness in substance and not merely in form. Knetsch v. United States,364 U.S. 361 (1960). A careful analysis of the computer printout provided to petitioners by the insurance agent shows that after eliminating the so-called "loans" and the offsetting "premiums," the insurance package sold to petitioner is substantially a typical ordinary life or whole life policy in the face amount of $ 500,000 with annual premiums ranging from $ 57,763 to $ 90,514. We are not actuaries *500 and there is no evidence in the record to establish what the annual premiums would normally be for a policy in the amount of $ 500,000 on the life of a person the age of petitioner-wife. However, our experience suggests that the amounts paid were not very far off the mark. In this unique policy, there is superimposed on the ordinary whole life policy an "ultimate" policy with an additional premium of $ 7177,915 in the first year and an additional premium in the sixth year of $ 326,145. These premiums equal the increases in cash value of the policy which petitioner immediately borrowed. There were other loans from time to time which are not related to additional premium payments but which would be out of normally accumulated cash surrender values. Petitioners have argued that these loan transactions posses the requisite economic substance because they provide additional insurance coverage. This argument is without merit because any additional coverage was nullified by the amount of the outstanding loan which would have been recovered from the proceeds before any death benefit would have been paid. Although petitioners claim that they purchased $ 2,000,000 worth of coverage, the *501 policy loans were so substantial that the greatest net death benefit payable after age 70 was $ 708,138. Under these circumstances, we must conclude that the sole purpose of this paper shuffling was an attempt to covert part of what would have been a normal premium for a $ 500,000 policy to interest deductible on petitioners' income tax return. We conclude that no valid loan existed from the insurance company to petitioner and that the alleged "interest" deducted by petitioner was nothing more or less than part of the premium for this ordinary whole life policy. This conclusion makes it unnecessary to consider the arguments made by respondent under section 264. We deem it unnecessary to comment further on any of the arguments made by petitioner. Decision will be entered under Rule 155.
APPENDIX A END
TOTAL
YEAR
CASH
TOTAL
ANNUAL
GROSS
ANNUAL
YEAR
AGE
VALUE
LOAN
PREMIUM
INTEREST
OUTLAY
LOAN
1
57
717,915
717,915
731,095
43,075
774,170
717,915
2
58
743,042
743,042
13,180
44,583
57,763
25,127
3
59
769,049
757,455
13,180
45,447
58,627
14,413
4
60
800,965
757,455
13,180
45,447
58,627
0
5
61
833,824
757,455
13,180
45,447
58,627
0
6
62
866,658
757,455
13,180
45,447
58,627
0
7
63
899,501
757,566
13,180
45,447
58,627
0
8
64
932,888
780,822
13,180
46,849
60,029
23,367
9
65
965,857
804,434
13,180
48,266
61,446
23,612
AGE 65 TOTALS
836,535
410,009
1246,544
10
66
1324,589
1165,514
339,325
69,871
409,196
360,080
11
67
1368,750
1198,987
13,180
71,939
85,119
34,473
12
68
1412,009
1228,777
13,180
73,727
86,907
29,790
13
69
1455,422
1258,757
13,180
75,525
88,705
29,980
14
70
1497,046
1288,908
13,180
77,334
90,514
30,151
AGE 70 TOTALS
1228,580
778,406
2006,986
*502 NET
END
TOTAL
AFTER
CASH VALUE
YEAR
CASH
EXPERIENCE
NET
TAX
TAX
ANNUAL
YEAR
AGE
VALUE
REFUND
OUTLAY
SAVINGS
OUTLAY
INCREASE
1
57
717,915
0
56,255
21,537
34,717
0 2
58
743,042
0
32,635
22,291
10,344
0 3
59
769,049
11,146
33,069
22,724
10,345
11,594 4
60
800,965
11,536
47,092
22,724
24,368
31,917 5
61
833,824
11,939
46,688
22,724
23,964
32,859 6
62
866,658
12,357
46,270
22,724
23,546
32,834 7
63
899,501
12,790
45,837
22,724
23,114
32,843 8
64
932,888
13,238
23,425
23,425
0
10,020 9
65
965,857
13,701
24,133
24,133
0
9,356 14,180
AGE 65 TOTALS
100,887
355,404
205,005
150,399
10
66
1324,589
14,180
34,935
34,935
0
1,348-
11
67
1368,750
14,677
35,970
35,970
0
9,688 12
68
1412,009
20,254
36,863
36,863
0
13,469 13
69
1455,422
20,963
37,763
37,763
0
13,433 14
70
1497,046
21,696
38,667
38,667
0
11,474 22,456
AGE 70 TOTALS
200,932
539,602
389,203
150,399
END
TOTAL
NET TOTAL
NET
YEAR
CASH
CASH
DEATH
YEAR
AGE
VALUE
VALUE
BENEFIT
1
57
717,915
0
500,000
2
58
743,042
0
500,000
3
59
769,049
11,594
511,594
4
60
800,965
43,510
538,510
5
61
833,824
76,369
566,369
6
62
866,658
109,203
595,203
7
63
899,501
142,046
625,046
8
64
932,888
152,066
632,566
9
65
965,857
161,423
640,923
AGE 65 TOTALS
10
66
1324,589
160,075
640,075
11
67
1368,750
169,763
651,263
12
68
1412,009
183,232
668,732
13
69
1455,422
196,665
687,665
14
70
1497,046
208,138
708,138
*503 Footnotes
1. Prior to trial, petitioners filed an amended petition in which they stated that on June 2, 1986 they received a refund in the amount of $ 72,490 for taxes paid for the 1980 tax year. This refund was due to an amended return filed for 1980 which reflected a net operating loss carryback from the 1983 calendar year. In his answer to the amended petition, respondent asserted an increase in the deficiency for the 1980 tax year in the amount of $ 72,490. The record provides no information concerning the basis for the increased deficiency. Therefore, we must conclude that respondent has not met his burden of proving his entitlement to an increased deficiency. Rule 142, Tax Court Rules of Practice and Procedure.↩ We assume that any other matter concerning the proper tax due in accordance with our decision herein will be resolved in the Rule 155 computations. 2. Petitioners did not purchase a similar policy on the life of petitioner-husband. We find this perplexing in view of petitioner's statements that the purpose of the insurance was to have a source of cash for estate tax purposes. ↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. ↩