ALBERT J. AND MARIE A. ALESSANDRA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Alessandra v. Commissioner
Docket Nos. 13808-82, 12407-83, 431-90
United States Tax Court
T.C. Memo 1995-238; 1995 Tax Ct. Memo LEXIS 240; 69 T.C.M. (CCH) 2768; June 1, 1995, Filed *240 An order denying petitioners' motions will be issued. For Albert J. Alessandra, petitioner: F. Whitten Peters and William M. Wiltshire. For Marie A. Alessandra, petitioner: W. James Slaughter and Donald E. Slaughter. For respondent: Wilton A. Baker. PANUTHOS
PANUTHOS
MEMORANDUM OPINION PANUTHOS, Chief Special Trial Judge: These consolidated cases were assigned to Chief Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1978
$ 1,794.00
--
--
--
1979
32,779.82
$ 1,638.99
--
--
1980
165,285.00
8,264.25
--
--
1981
1,528,978.00
--
$ 76,448.90
50% of the inter-
est due on the deficiency *241 At the time of filing the petitions, petitioners resided in Rolling Hills Estates, California. For the years at issue, petitioners were married and filed joint Federal income tax returns. These cases are currently before the Court on petitioner Albert J. Alessandra's (petitioner) Motion for Partial Summary Judgment in which petitioner Marie A. Alessandra joins. Respondent filed objections to petitioners' motions. Petitioners' motions and respondent's objections thereto raise the following issues: (1) Whether interest earned in connection with the Futures Trading, Inc. (FTI) Arbitrage & Carry (A/C) Program is includable in petitioners' 1980 and 1981 taxable income; and (2) whether fees and commissions earned in connection with the FTI and Merit Securities, Inc. (Merit), programs are includable in petitioners' taxable income. The parties filed a Third Stipulation of Facts "in order to place the interest and commission income issues before the Court without unnecessary factual disputes." The parties' briefs and the stipulation indicate that there is no genuine issue as to any material fact. Accordingly, we believe that through summary adjudication a decision of the issues may *242 be rendered as a matter of law. [2]
The FTI A/C program is one of the Merit Securities project issues addressed by this Court in Seykota v. Commissioner, T.C. Memo. 1991-234 (Seykota I), supplemented by T.C. Memo. 1991-541 (Seykota II). [3] In Seykota I, we held the FTI A/C program to be an economic sham and disallowed deductions claimed by the taxpayers for losses incurred in connection with the FTI A/C program. [4] In Seykota II, we held that the taxpayer Seykota was not entitled to deduct interest expenses incurred to acquire *243 gold bullion in connection with the FTI A/C program because the interest payments "merely functioned as the first part of a scheme for the mismatching of deductions and income." Background
Some of the facts have been stipulated and they are so found. The stipulations of fact are incorporated herein by this reference. Petitioner was a partner in WFM #1 during 1980 and 1981. WFM #1 participated in the FTI A/C program and the Merit Treasury-Bill (T-Bill) Options program during *244 those years. The FTI A/C program fundamentally was a gold cash and carry program. In a typical cash and carry program, the participant purchases a commodity, usually a precious metal, with borrowed funds at the "spot price," and at the same time enters into a contract to sell the commodity at a future date. The "spot price," which is the sale price of the commodity on any given date, is usually equal to the futures price less the cost of carrying the commodity to the delivery date of the futures contract. [5] *245 The carrying costs include interest, storage, handling, insurance, and monitoring and management fees. Id. The participant deducts the carrying cost from his ordinary income and, upon later delivery of the commodity, recognizes as long-term capital gain the difference between the futures contract price (the sale price) and the spot price (participant's basis). The long-term capital gain, usually recognized by the participant in a subsequent year, is essentially equal to the amount of deductions taken for the cost to carry the commodity. The participant, therefore, defers recognition of income and effectively converts ordinary income into long-term capital gain. [6]
World Futures Management, a corporation, orchestrated WFM #1's investment in the FTI A/C program. According to the plan, WFM #1 entered into futures contracts to purchase gold (long futures contracts), using funds borrowed from Chase Manhattan Bank (Chase), and, at the same time, entered into longer-term futures contracts to sell an equivalent amount of gold *246 (short futures contracts). Id.WFM #1 took possession of the gold under its "long" futures contracts and later delivered the gold under the "short" futures contracts. Id.
The program required WFM #1 to establish a commodity account with a participating brokerage firm. In order for Chase to provide financing, the arrangement also required that funds not invested in the commodity account be held in an interest-bearing account opened at Chase. WFM #1 established a commodity account with the participating brokerage firm of Shearson, Hayden & Stone (Shearson). Id. Shearson required WFM #1 to maintain a margin account and accepted Treasury Bills owned by WFM #1 as margin in lieu of cash. Every investor in the FTI A/C program, including WFM #1, participated in the Merit project ostensibly to hedge against fluctuations of interest rates upon the gold carries. Id. The Merit project involved the trading of options on T-Bills or T-Bonds. Id. Petitioner promoted all of the programs included in the Merit project, for which petitioner received fees and commissions in the amount of $ 208,634. WFM #1 reported interest income in 1980 and 1981 from interest paid by Chase *247 on the interest-bearing account and from interest paid by the U.S. Government on T-Bills held in the Shearson account. [7] On their Federal income tax return for 1980, petitioners reported losses, gains, and expenses from the partnership interest in WFM #1 as follows: Ordinary
Short-term
Long-term Investment
income
capital capital interest
(loss)
gain (loss) gain (loss) expense Merit Securities
$ (64,029)
$ (21,620)
$ 46,751
$ 4,874
Project Other
6,150
--
--
--
Total
$ (57,879)
$ (21,620)
$ 46,751
$ 4,874
The ordinary income corresponding to the "other" category on the table above includes petitioner's share of income reported by WFM #1 as interest income. On Schedule E of their 1981 Federal income tax return, petitioners reported $ 1,216 of ordinary income from petitioner's partnership *248 interest in WFM #1. This amount includes petitioner's share of income reported by WFM #1 as interest income. Also, on their 1981 Federal income tax return, petitioners reported $ 208,634 of miscellaneous income, consisting of fees and commissions received by petitioner for promoting the programs included in the Merit project. Discussion
As an initial matter, we address petitioners' contention that we should follow an unpublished order of this Court concerning different taxpayers who also participated in the Merit Securities project. Petitioners were not party to that case and did not present any agreement or stipulation that would subject them to the results of that case. Accordingly, they are not subject to the order. Moreover, this Court does not recognize unpublished orders as precedent. Halliburton Co. v. Commissioner, 98 T.C. 88, 96 n.6 (1992); Brock v. Commissioner, 92 T.C. 1127, 1132 (1989). Accordingly, the unpublished order has no bearing on this case. A transaction entered into without business or profit-making function apart from obtaining tax benefits is considered a transaction devoid of economic *249 substance or a sham. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987-628, affg. Sturm v. Commissioner, T.C. Memo. 1987-625, Moore v. Commissioner, T.C. Memo. 1987-626, and affg. in part and revg. in part Larsen v. Commissioner, 89 T.C. 1229 (1987); Sheldon v. Commissioner, 94 T.C. 738, 759 (1990). It is a basic premise of tax law that a transaction devoid of economic substance, or a sham transaction, "simply is not recognized for federal taxation purposes, for better or for worse." Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir. 1991), affg. Fox v. Commissioner, T.C. Memo. 1988-570. A taxpayer, therefore, is not entitled to deduct amounts paid as interest if the underlying transaction is a sham. Knetsch v. United States, 364 U.S. 361, 366 (1960); Shirar v. Commissioner, 916 F.2d 1414, 1417 (9th Cir. 1990), revg. T.C. Memo. 1987-492; *250 Sheldon v. Commissioner, supra at 760. By the same token, a taxpayer need not recognize interest income attributable to a sham transaction. Sheldon v. Commissioner, supra at 762; Arrowhead Mountain Getaway, Ltd. v. Commissioner, T.C. Memo. 1995-54. Petitioners contend that because we held in Seykota I and Seykota II that the FTI A/C program was a sham and denied deductions for interest expense in connection with the program, all interest and commissions income earned in connection with that program should be excluded from income. [8] In Sheldon v. Commissioner, supra, we stated that a transaction will not be respected unless it is imbued with tax-independent considerations. Id. at 759 (citing Frank Lyon Co. v. United States, 435 U.S. 561 (1978)). "Loans or other financing transactions will merit respect and give rise to deductible interest only if there is some tax-independent purpose for the transactions." Id. We further stated that "Interest * * * is not deductible if the underlying *251 transaction is a sham". Id. at 760. Petitioners would have us interpret Sheldon as holding that when a program constitutes a sham, all transactions in connection with that program should be disregarded for Federal income tax purposes. [9]
Sheldon involved the question of whether repurchase agreements (repos) had a tax-independent purpose. Id. at 759. A repo is a transaction entered into to finance, in the case of Sheldon, the purchase of a T-Bill by immediately selling the T-Bill to another party with an agreement *252 to repurchase, for the same price plus interest, on or before the date the T-Bill matures. Id. at 742. [10] This Court held that the repo transactions in Sheldon had no utility apart from the anticipated tax consequences because by design the interest paid on the repo was greater than the interest earned on the T-Bill. Id. at 762. Thus, the Court disallowed all deductions claimed in connection with the repos and stated that interest income earned also should not be recognized. Id.; see also United States v. Wexler, 31 F.3d 117, 125-126 (3d Cir. 1994) ("There is no debt obligation that can be separated from the underlying repo scheme or that was undertaken for some reason other than the tax benefits of deducting interest on that obligation itself.") *253 While we did not define the extent of the required "tax-independent" purpose, we believe it is not as broad as petitioner would have us read it. In any event, there is authority that a sham transaction may contain elements whose form reflects economic substance and whose normal tax consequences therefore may not be disregarded. Jacobson v. Commissioner, 915 F.2d 832, 840 (2d Cir. 1990), revg. T.C. Memo. 1988-341; Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23; Rice's Toyota World v. Commissioner, 752 F.2d 89, 96 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Rose v. Commissioner, 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Rice's Toyota World concerned a tax-avoidance scheme, whereby the taxpayer borrowed funds from the promoter to purchase a computer, executed a recourse note in favor of the promoter, and immediately leased the computer to the *254 promoter. Id. at 91. The note was to be repaid in installments which exceeded the rental payments to be received from the promoter. Id. The primary benefit of the scheme consisted of the accelerated depreciation deductions taken with respect to the taxpayer's basis in the computer, which included the entire amount of the recourse note. Id. at 93. The Court of Appeals for the Fourth Circuit reversed this Court in part by holding that the recourse note was an obligation of economic substance from which the taxpayer could not walk away. Id. at 96. The Court of Appeals for the Fourth Circuit, therefore, allowed the taxpayer to deduct the interest on the note, although the principal, which constituted the "fee" to obtain the tax benefits, was to be disregarded for basis depreciation purposes. Id. at 96. In Rose v. Commissioner, supra at 419-420, we adopted the reasoning of Rice's Toyota World v. Commissioner, supra, and stated that bona fide third-party debt may indicate that a part of a transaction should be recognized. We allowed the taxpayers to deduct interest on recourse notes issued *255 to the promoters of a tax shelter in order to finance the participation in the shelters, holding that even if the principal amounts of the notes themselves do not give rise to tax deductions because they were payments for anticipated tax benefits, the interest actually paid on those notes is deductible. Rose v. Commissioner, supra, at 423. In Seykota II, we distinguished the facts from Rice's Toyota World and Rose and cited Sheldon v. Commissioner, 94 T.C. 738 (1990), as authority for disallowing deductions of interest paid to finance the purchase of the gold. We found that the interest payments should not be severed from the transaction because they were an integral part of the tax-motivated sham. Seykota II. The loan had no economic utility other than to generate tax deductions which would later be recouped in the form of roughly equivalent long-term capital gains. Id. Therefore, the interest on the loan to purchase the gold was more analogous to the interest on the repo transaction in Sheldon than to the interest payments in Rose. Our opinion in Sheldon has been viewed in opinions of *256 this Court and of the Court of Appeals for the Third Circuit as seemingly in tension with the previous opinions in Rice's Toyota World and Rose. United States v. Wexler, 31 F.3d 117, 127 (3d Cir. 1994); Lieber v. Commissioner, T.C. Memo. 1993-424; Arrowhead Mountain Getaway, Ltd. v. Commissioner, T.C. Memo. 1995-54. We need not analyze whether Sheldon is inconsistent with Rice's Toyota World and Rose because, in this case, we look to opinions of the Court of Appeals for the Ninth Circuit in accordance with the doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Ninth Circuit, to which this case is appealable, has held that "indebtedness undertaken to fund a sham transaction is not necessarily a sham". Bail Bonds by Marvin Nelson, Inc. v. Commissioner, supra at 1549. A transaction involving use of a loan to fund a tax avoidance scheme cannot be disregarded in its entirety unless the interest obligation *257 has been separately examined and found to be a sham. Id. In determining whether a transaction is a sham, the Court of Appeals for the Ninth Circuit typically focuses on two related factors: (1) Has the taxpayer shown that it had a business purpose other than tax avoidance? (2) Has the taxpayer shown that the transaction had economic substance beyond the creation of tax benefits? Casebeer v. Commissioner, 909 F.2d 1360, 1365 (9th Cir. 1990), affg. T.C. Memo. 1987-628, affg. Sturm v. Commissioner, T.C. Memo. 1987-625, affg. Moore v. Commissioner, T.C. Memo. 1987-626, affg. in part and revg. in part Larsen v. Commissioner, 89 T.C. 1229 (1987). Bail Bonds by Marvin Nelson, Inc. v. Commissioner, supra, concerned two loans of $ 15,000 and $ 25,000 from a foreign corporation (the "lender"), which was effectively controlled by the promoter of the transaction, to the taxpayer who issued promissory notes to the lender in return. Id. at 1546. The taxpayer used the proceeds *258 of the loans to make reinsurance payments to another foreign corporation (the "reinsurer"), which was operated by the promoter of the scheme. Id. The taxpayer deducted interest payments on the loans. Id. at 1547. The proceeds from the $ 25,000 loan were essentially returned to the lender when $ 25,000 of reinsurance payments were transferred from the reinsurer to the lender. Id. at 1546. The Court of Appeals for the Ninth Circuit examined each loan separately, and held that the $ 25,000 loan was a sham because it was shaped solely by tax avoidance concerns. Id. at 1549. The proceeds were circulated back to the lender, and the taxpayer did not actually secure the use or pay for the use of the proceeds. Id. The Court of Appeals for the Ninth Circuit also held that the taxpayer failed to prove that the $ 15,000 loan had a business purpose or economic substance. Id. at 1550. Consistent with the analysis of the Court of Appeals for the Ninth Circuit, we separately examine the transactions at issue to determine if they are economic shams. The fact *259 that the transactions generated income, not deductions, does not affect our inquiry because if the transactions are determined to be shams, they are ignored for tax purposes. Sheldon v. Commissioner, 94 T.C. 738, 760 (1990). On the other hand, if the transactions are not shams, then the income and deductions are recognized for tax purposes. Each of the transactions that is the subject of this motion had distinct economic utility other than any anticipated tax benefits. The T-Bills are U.S. Government obligations, representing bona fide debt and bearing interest paid by the U.S. Government. Their purchase was neither required nor anticipated by the FTI A/C program. Rather, the motive behind the purchase of the T-Bills was to realize interest income. The incidental fact that they were placed in the Shearson account as margin in lieu of cash does not alter the tax-independent considerations in their purchase. Therefore, we find that the T-Bills were not shams and that interest accrued on the T-Bills is includable in petitioners' income. Similarly, the establishment of the interest-bearing account at Chase created a valid obligation of a third party, *260 unconnected to petitioners, to pay interest to petitioners. There were no tax benefits to be obtained with respect to interest earned on funds placed in that bank account. The fact that petitioners were required to establish the account in connection with the FTI A/C program and maintain a certain balance does not shield them from recognizing such interest as income. The account was established merely to facilitate the operation of the program and was not integral to the creation of the intended tax consequences of the program. Cf. Seykota II (the disallowed interest deductions were the tax benefit to be obtained). Accordingly, petitioners must recognize interest income earned on funds placed in the Chase account. Finally, the commissions income earned by petitioner for promoting the programs is includable in petitioners' income because petitioner's motivation in promoting the program was to earn commissions. The fact that the transaction was found to be a sham does not alter petitioner's motivation in promoting it or the fact that petitioner received income. To reflect the foregoing, An order denying petitioners' motions will be issued. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the tax year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. A decision on the merits of a taxpayer's claim may be made by summary adjudication "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); Naftel v. Commissioner, 85 T.C. 527, 529↩ (1985).
3. Seykota v. Commissioner, T.C. Memo. 1991-234 (Seykota I), supplemented by T.C. Memo. 1991-541↩ (Seykota II), also addressed the Treasury Bill and Treasury Bond Option programs and the Stock Forward Contracts program promoted by Merit Securities, Inc.
4. We also held that sec. 108 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, as amended by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, did not entitle taxpayer Seykota to deduct his losses.↩
5. There exists a very slight possibility of an "inversion," which occurs when the spot price of a commodity rises above its forward price. If this occurs, the investor is able to sell the commodity at the high spot price for a profit and cover any remaining obligation to sell the commodity by acquiring a new futures contract to sell at the prevailing lower forward price. Seykota I, supra↩.
6. As a part of an effort to remedy the mismatching of income and deductions resulting from straddle transactions, Congress enacted sec. 263(g), effective generally for property acquired and positions established after June 23, 1981, in tax years ending after that date. Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 502, 95 Stat. 327. Sec. 263(g) generally provides that no deduction is allowed with respect to "interest and carrying charges properly allocable to personal property which is part of a straddle (as defined in sec. 1092(c))." Sec. 263(g)(1). The amount disallowed is capitalized and added to the basis of the personal property. Id. Sec. 263(g) is not applicable to the transactions in issue. Seykota II, supra↩.
7. The parties have not reached an agreement concerning the amount of income reported from each source. The allocation between the two sources of income has no effect on our holding.↩
8. Petitioner Albert J. Alessandra filed a status report stating that he stipulated to be bound to the results in the Seykota test cases except for issues relating to sec. 108 of the Deficit Reduction Act and issues of interest and commission income, which are the issues of this opinion.↩
9. Petitioner does not specifically promote this interpretation, but rather relies on a previous unpublished order of this Court. As we discuss supra↩, we are not bound by that unpublished order.
10. For more in-depth discussions of repo transactions, see SEC v. Miller, 495 F.Supp. 465, 466-473 (S.D.N.Y. 1980); In re Bevill, Bresler & Schulman Asset Management Corp., 67 Bankr. 557↩, 566-571 (D.N.J. 1986).